**Marian TIPP, Plaintiff,**

v.

**AMSOUTH BANK, Defendant.**

**No. CA–95–0882–MJ–C.[1]**

United States District Court,
S.D. Alabama,
Southern Division.

May 19, 1998.

---

1. In November of 1997 the parties, in accordance with the provisions of 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73(c), consented to the exercise of jurisdiction in this case by the undersigned Magistrate Judge. (Doc. 107) Pursuant to that consent, the parties understand that any appeal from this point forward "shall be taken" to the Eleventh Circuit Court of Appeals. (*Id.*) On February 2, 1998, United States District Judge Richard W. Vollmer, Jr., referred to the Magistrate Judge all pending motions which in a previous order (Doc. 106) he had retained jurisdiction over (Doc. 121) and this is the reason the undersigned is presently considering the renewed motion for summary judgment.

1316

Marian Tipp, Mobile, AL, Pro se.

Marcus McCrory, Kaffer & Hannan, Mobile, AL, for Plaintiff.

## MEMORANDUM OPINION AND ORDER

CASSADY, United States Magistrate Judge.

This case is before the Court on defendant AmSouth Bank's renewed motion for summary judgment, on plaintiff's remaining claims of hostile work environment as it pertains to gender and retaliation, filed on June 6, 1997 (Doc. 54). The Court is of the opinion that defendant's renewed motion for summary judgment is due to be **DENIED**.

### FINDINGS OF FACT

1. In 1978, plaintiff was hired as a Mineral Clerk in the Energy Department of the First National Bank of Mobile. (Doc. 31, Affidavit of Charles Frederick Rogan, ¶ 2) AmSouth Bank purchased First National Bank in 1985 and hired Tipp to continue in her then-existing job. (*Id.*) Due to bank reorganization and job transfers over the years, Tipp ended up in the Real Estate/Natural Resources Department. (*Id.*)

2. Despite plaintiff's generally acceptable performance with AmSouth, which eventually led to her promotion in 1992 to Trust Oil and Gas Coordinator (*id.,* ¶ 3),

her history of employment at AmSouth reveals a number of recurring problems, specifically, an inability to properly and timely file documents, an inability to maintain an orderly work space, and spending a significant amount of work time on personal phone calls. (*See* Doc. 54, Exhibits 5 – 16; Marian Tipp depo., pp. 74, 100–104) As a result, plaintiff received verbal and written counseling and was placed on probation on three separate occasions for unacceptable job performance. (*See* Doc. 54, Exhibits 5, 6, 9 & 11; Tipp depo., at 100–101, 103)

3. In November, 1980, Mr. R. Rothrock, Tipp's supervisor at the time, rated her performance as provisional (i.e., probationary) and noted that plaintiff "spends entirely too much time on the telephone on personal calls. She needs to recognize deadlines and customer service requirements." (Doc. 54, Exhibit 5) Shortly thereafter, Markel Wyatt became plaintiff's supervisor. (*See id.,* Exhibits 6 & 7)

4. In January 1982, Wyatt had become so dissatisfied with plaintiff's improper filing and general disorganization that he warned her that her job was in danger. (*Id.,* Exhibit 6)

As per our conversation yesterday and at your last review we discussed the filing that accumulates on your desk. You promised that you would make every effort to catch up and keep an orderly income/outgoing basket file on your desk. It appears that this system has already deteriorated into nothing but a catch all file with no resemblance of order.

I can not continue for our section of this department to operate in this fashion. The material that needs to be filed is important to me and my work here at the bank and your performance in not getting these documents filed in the proper trust account folder is making my job as well as your own difficult. I can never find the copies of my correspondence until several months later when it finally appears in the proper folder. I am not going to tolerate this

any longer. You can catch up with your filing immediately or find yourself another position here at the bank or no job at all. I am serious about this.

I do not think I have been unfair to you; I have reminded you to (sic) many times of this matter. I will not remind you again, either get it done by the end of this month or you will force me to take more drastic action.

You have ample time to do your work. You do excellent work when you put your mind and time to it. This bank expects to pay you for 8 hours of honest work and not 8 hours while on the telephone. Get your personal affairs attended to after banking hours and request your friends not to call you here at the bank, within reason of course. You are going to have to put your mind on the job when you come into this department everyday and not on everything else but your work.

The reason you and I find bills unpaid and checks undeposited is due directly to your unorganized desk. Shape it up. Get the job done and you'll hear no complaints from me. Don't and you'll be looking for employment. I think I'm clear.

I don't expect for you to make a token effort at this filing matter. That is, go through motions of getting this done for now attitude. You will and I expect for you to keep up with your filing on a weekly basis. Do no[t] let it accumulate. It does not make my job pleasant or any easier.

Should you wish to discuss this with me I'll be glad to.

(*Id.*) Although Wyatt continued to believe at plaintiff's semi-annual job review on May 16, 1983 that Tipp needed to improve upon her filing and the neatness of her work area, plaintiff had obviously improved the condition of her desk to a tolerable level inasmuch as she received a commendable job performance rating by Wyatt. (*Id.*, Exhibit 7) Again, in January of 1984, Wyatt rated Tipp's job performance as commendable but noted that improvement was needed in the area of gen-

eral housekeeping and filing and that she needed to limit her personal phone conversations. (*Id.*, Exhibit 8)

5. On April 11, 1984, Tom Gause, Wyatt's immediate supervisor (*see id.*), wrote Tipp the following memo about the appearance of her desk: "*I want you to leave your desk in better order each day* [.] If you have any questions about what I expect—ask me[.] ... I've mentioned this on several occasions in a nice way[.] I expect improvement immediately[.] Your desk[']s appearance reflects badly on this department and the bank!" (*Id.*, Exhibit 9)

6. Tipp's June, 1984 semi-annual review reveals a rating of "Meets Expectations[.]" (*Id.*, Exhibit 10) The one area in which Wyatt noted that improvement was needed was work habits, specific mention being made that Tipp did not post checks in a timely manner and that her work station was disorganized. (*Id.*) Objectives noted for the next review period were the following: "1. Organize work area in a more business[-]like fashion; such as file work *daily*, put items such as check stubs in files on a *daily* basis. File correspondence on a *weekly* basis—Friday. 2. Comply with Comptroller of the Currency Requirement 12 CFR 9.10(a): 'Cash should be made productive within one week after receipt[.]' This applies to lease bonds, royalties, & delay rentals[.]" (*Id.*)

7. On July 23, 1984, plaintiff was placed on probation for a period of ninety (90) days due to unsatisfactory job performance and violation of bank policy/procedure. (*Id.*, Exhibit 11)

On July 10, a royalty check made payable to a Trust account in the amount of $5,465.03 was discovered in [Marian Tipp's] desk. This check was dated November 30, 1983 and should have been credited to the Trust account in December of 1983. Additionally, 6 other stale checks dated from Jan. 23, 1984 to Feb. 27, 1984 were also located inside the overnight storage check bag; these checks totaled $4,536.34 and should have been credited to 3 other Trust accounts.

The check in the amount of $5,465.03 was misplaced, in my opinion, due to carelessness and by not properly filing routine items on a daily basis. The other 6 checks represent a direct violation of the Comptroller of the Currency's requirement regarding treatment of funds awaiting investment, "funds should be made productive after receipt within one week." The employee has been warned about the disorganization around and in her desk in memos from Tom Gause and myself on $\frac{1}{82}$ and 4/84. These items have also been cited on her reviews of $\frac{5}{82}$, $\frac{5}{83}$ and $\frac{5}{84}$ as needing improvement. She has also received numerous verbal instructions to clean up and file her work load on a daily basis. (*Id.*)

8. On the November, 1984 semi-annual review, Wyatt rated Tipp's overall job performance as satisfactory but noted that improvement was still needed in the area of organization of work. (*Id.*, Exhibit 12 (with respect to the objectives set in June, 1984 Wyatt noted that Tipp's progress in organizing her work area in a more orderly fashion and filing work daily was less than expected though good progress had been made in this area))

9. The May, 1985 semi-annual appraisal reflects that Tipp had improved the organization of her work to the point that Wyatt rated her work habits as satisfactory and noted that her progress in this area was as expected. (*See* Doc. 31, Exhibit 1) Six months later, in January of 1986, Wyatt rated Tipp's overall job performance as outstanding and made no mention of any organizational problems. (*Id.*, Exhibit 2) Apparently, Tipp received similar reviews between January of 1986 and August of 1989, the date of the next appraisal form made a part of this record. (*See* Doc. 54, Exhibit 13) In August of 1989, Wyatt rated Tipp's overall job performance as "More than Expected" but noted that Tipp had shown a tendency "to let 'outside matters' interfere with day's work." (*Id.*) One year later in August of 1990, Wyatt again rated Tipp's overall job performance as "More that Expected" but noted that Tipp needed to improve in the area of dependability because "some of the officers she reports to feel that she has a problem in carrying out long term assignments & some routine matters that require thoroughness[.]" (*Id.*, Exhibit 14)

10. Apparently, there were no problems noted with respect to Tipp's job performance between August of 1990 and August of 1992 since the next appraisal form made a part of this record is the one completed in August of 1992. (*See* Doc. 31, Exhibit 16) Before that appraisal, however, several significant events occurred. On June 9, 1992, Wyatt and Greg Wittendorfer sent a memo to Tipp and Pat Palmer informing them that their lunch periods would be shortened to thirty (30) minutes and of the specific times they were to take their lunch breaks and two fifteen minute breaks. (Doc. 54, Exhibit 15) "When all accumulated filing has been caught up (including desk files, to-be-filed boxes, and file sorters) the lunch period will be extended to one (1) full hour. All filing will then be kept up to date each week, by designating the hours of 2:00–5:00 p.m. every Friday as a time slot to exclusively perform such function. Only in case of crucial deadlines or emergency shall this designated time period and assignment be interrupted." (*Id.*) Tipp and Palmer were notified on June 24, 1992 that their one-hour lunch periods were reinstated. (*See id.*, Exhibit 16)

> The time period designated for filing on Fridays from 2–5 pm remains the same. There still remains a considerable amount of materials on desks that need immediate attention and make their way to the trust files. The backlog of filing should be totally completed by Friday afternoon, July 3rd. After that date, all filing will be kept up to date on a weekly basis.
>
> Before leaving work each day,[2] all desk areas and P.C. workstations are to be policed. Trash, old memo notes, rough

2. On Tipp's copy of the memo, Wyatt inserted this additional comment: "Marian—Let's get

drafts, scratch paper, etc. should be disposed of and not allowed to accumulate on desks. This is not only unsightly but also contributes to paper mixups, mistakes, and confusion when others are looking for some important item. Excess stationary needs to be re-boxed or placed in an appropriate folder/cabinet. Copies of letters, memos, legal documents, check stubs, etc. should be placed in your filing box or to be filed index folder. Under no circumstances should a lease file, legal file, or natural resources file be kept on one's desk after its use has been completed. Others within the office need to be able to access these files without searching for them.

Let's all show a little more corporate pride by projecting a more professional image to the customers that visit our area of the bank by keeping our respective work areas neat and orderly. Also in this regard, please review AmSouth's policy on dress, which is a standard which we all need to keep in mind.

Thank you for your cooperation on these matters.

(*Id.*)

11. In July 1992, plaintiff complained to AmSouth's Human Resources Department in Birmingham that Wyatt had sexually harassed her. (*See* Marian Tipp depo., pp. 18, 25–26; [3] Exhibit 1 (in EEOC complaint Tipp refers to the internal grievance and represents that she stated in the grievance that in the past Wyatt had slapped her on the buttocks, accused her of having sex with her horse and opined that a computer was like sex for her)) AmSouth conducted an investigation into plaintiff's allegations but was unable to

confirm any inappropriate sexual behavior. (Doc. 54, Tipp depo., at 88 (Vaughn Stough told her that he was unable to confirm any inappropriate sexual behavior in the past); *see also* Doc. 31, Exhibit 20 (Vaughn Stough's rough notes of the investigation, prepared after Tipp filed her EEOC charge, reveal that he told Tipp at the time that "inappropriate sexual behavior in the past" could not be confirmed); Doc. 54, Exhibit 1, ¶ VII ("After Stough's 'investigation' he said that we would have to make things work together and that there would be other arrangements made if we did not. He told us there would be no more sexual comments. Wyatt denied the allegations against him and said I didn't know how to take a joke.")) Nevertheless, plaintiff was assured that the Bank would not tolerate sexual harassment and that she should immediately report any inappropriate conduct. (Doc. 54, Tipp depo. at 88). Plaintiff made no further allegations of sexual harassment. (*See id.* at 91–92)

12. Although AmSouth's internal investigation did not confirm Tipp's allegations of sexual harassment, Stough did find that Wyatt "was loud and unprofessional in the way that he corrected [Tipp]." (Doc. 31, Exhibit 20) This statement, along with the declaration statements that Wyatt had temper tantrums, got upset with Tipp, was a jerk to everyone and had a short-fuse for everyone (Doc. 54, Exhibit 21, Declaration of Brenda Stewart; *see also id.*, Exhibit 20, Declaration of Pat Palmer (Wyatt gets angry and loses control of his temper); Exhibit 19, Declaration of Ledrester Collins (witnessed Wyatt get angry with Tipp)), establishes that prior to Tipp's filing of the internal grievance in July of 1992,[4] Wyatt would scream, holler and

going with this! ... Last warning[.]" (*Id.*)

**3.** Tipp has testified that she called Tom Gause at his home in Orange Beach, Alabama four or five days prior to filing the written complaint to inform him of the treatment she was receiving from Wyatt and "begged him to please do something[.]" (*See* Doc. 31, Marian Tipp depo., pp. 24–26) According to Tipp, she complained to Gause about Wyatt's behavior on several other occasions prior to

filing the internal complaint but did not put anything in writing on these occasions; rather, she simply went to his office and voiced her complaints. (*See id.* at 24)

**4.** During the investigation of Tipp's grievance, and shortly thereafter, the plaintiff also complained to Stough, and Gause, about Wyatt docking her pay on June 1, 1992. (*See* Doc. 54, Tipp depo., at 74 & 91) On July 23, 1992, Wyatt sent the following memorandum to

curse at her, as she had complained to Tom Gause on several occasions (*see* Doc. 31, Tipp depo., at 23–24). For instance, in 1990 or 1991, Tipp was doing some work for an individual, Bob Pearson, who worked in a different department and when Wyatt discovered this he "went into a rage" and told plaintiff that she "didn't work for Bob Pearson and that he didn't sign [her] f'ing paycheck[.]" (*Id.* at 28) [5] Moreover, after the internal grievance, Tipp claims the verbal abuse by Wyatt continued but that where as before Wyatt openly screamed, hollered and cursed at her, he began making comments only when there were no witnesses. (*Id.* at 69–70 [6]; *see also* Doc. 54, Tipp depo., at 71–72 (Wyatt kicked open the door to the conference room, while Tipp was on her lunch break and having a personal phone conversation with a friend, and demanded to know what she was doing [7]); Exhibit 22, Marian Tipp's Affidavit, ¶ 3 ("The verbal abuse, harassment, and retaliation by my supervisors, Markel Wyatt and Greg Wittendorfer continued up to and through October 11, 1993, when I suffered a nervous breakdown and was forced to go on medical disability leave.")) Finally, it is clear from the deposition testimony provided to this Court, that after the investigation Wyatt threatened to dock her pay (Doc. 54, Tipp depo., at 75–76) and told her that she could not have personal phone calls (*see id.*, at 99). However, Tipp made no further complaints to Stough or Gause about Wyatt's verbally abusive treatment of her after the investigation (Doc. 54, Tipp depo., at 92), even though Stough called her on several occasions afterwards to follow-up on how things were going and to conduct other business (*see* Doc. 31, Tipp depo., at 90).

13. On August 10, 1992, plaintiff received her Annual Performance Evaluation from Wyatt and Greg Wittendorfer. (Doc. 54, Exhibit 4) In that Evaluation, plaintiff's performance was rated overall as "Expected," including ratings of "More than Expected" in the categories of "Quantity of Work," "Job Knowledge," "Team Work and Cooperation," and "Work Leadership." (*See id.*) Nevertheless, plaintiff continued to demonstrate performance shortcomings in the areas of organization and assignment follow-through. (*See id.* (reviewers note a need for improvement in file creation, filing, with less misplaced documents, and in attitude towards accepting assignments))

14. On January 6, 1993, Wyatt sent a memo to Tipp regarding her filing backlog. (*See id.*, Exhibit 17)

---

Marcella Sims regarding Tipp's partial absence from work on June 1, 1992:

There has been a misunderstanding regarding the above employee's absence on the above date and the reporting of the time away from the bank. The absence was for less than four hours, but was an unexcused absence. However, there was a personal need of the employee to be away from work due to an emergency situation. The above person has been cautioned about the regularity of absences due to conflicting outside interests relating to a cattle and horse ranching operation.

I recommend that in this instance the above employee's absence be changed to "with pay" and credit of 2.15 regular hours be restored to the employee's next pay voucher.

The employee understands that all future absences of this nature will be deducted from accumulated leave or be with out (sic) pay.

(Doc. 31, Exhibit 22) Wyatt's recommendation was followed and Tipp was paid for this time. (*See* Doc. 54, Tipp depo., at 74–75)

5. Tipp also testified that Greg Wittendorfer called her a bitch on one occasion in 1992; however, she did not report this name-calling incident to anyone. (Doc. 31, Tipp depo., at 45–47)

6. Tipp testified that right before she took the medical leave of absence, Wyatt asked her for a file and she asked him "which one of the Fitzpatrick" and when the proper file was identified for her and she had commented that she did not remember that file Wyatt stated that he did not ask for her "fucking memory[,]" just the file. (*Id.* at 70)

7. On this particular occasion, Tipp had swapped lunch periods with Pat Palmer. (*Id.* at 71) This incident occurred in September of 1993. (Doc. 84, Affidavit of Marian Tipp)

Please catch up on all your filing, including the folder of correspondence in the file room that I have requested before to be filed (June '92).

Also refer to my memos of 7/9/92 & 7/24/92 regarding appearance of desk organization, file folders remaining out after uses, and Friday afternoon filing times.

This is your final notice on this matter. I expect your cooperation. (*Id.*) Tom Gause spoke with Tipp about her performance in May through July of 1993, specifically a complaint he had received from Greg Wittendorfer about her problems with filing. (*See id.*, Tipp depo., at 102) For instance, on May 12, 1993, Gause had a conference with Tipp and memorialized it as follows:

At 4:05 PM called Marian into my office—

Asked her when she would have filing complete—"I don't know, can start on it tomorrow." She talked about what she had been doing today—getting computers ready for auditors.

Said she didn't think filing was as important as things (how she was treated in past) she had brought to me. Said nothing was done. I asked if these had improved now. She said yes.

At one point she got mad, headed for door—said yes I know what to do—get another job. I stopped her and brought up [the] Employee assistance program. Marian said she was not going to call them.

I told her I didn't think she realized the severity of situation—something has to be done. I asked her if she thought she was doing a good job. She started talking about all the work she had done over the years.

I told her we have to start where we are; here and now and get job done. "I realize you can do anything in the de-

partment and work with Greg if you want too (sic)."

I asked if she had any suggestions or solutions to the situation. She shrugged her shoulders—no comment.

Overall conference very negative.

(Doc. 31, Exhibit 18) In addition, on July 9, 1993, Gause had a conference with Tipp and Wittendorfer (*id.*, Exhibit 21), in which the following occurred:

Called Marian into Greg's office—Greg present.

Told Marian ( & Greg) that she would have to do Greg's work in a satisfactory manner.

If there is personality conflict, both grown mature adults can work it out.

Greg—in office certain days, needs help—Told Marian not unreasonable for her to give Greg priority these times—

Asked about inspection reports—Haven't done—

Told Marian I was deadly serious know (sic) for long time but has to work out problems here & now—

(*Id.*)

15. On August 4, 1993, Wyatt and Wittendorfer rated plaintiff's overall job performance as "Unacceptable" in the Annual Performance Evaluation. (Doc. 54, Exhibit 18) "After considerable review & discussion by the officers within this dept., it is recommended that this employee be given a 90 day review & deferral notice, and if no substantial improvement is noted after this time period, she then be replaced. Marian has been counseled & instructed on several occasions within the past year to improve her overall job performance level, but has not responded. It appears that her level of satisfaction with her job has diminished and has negatively affected her overall work quality & output. Her lack of cooperation with supervisors and periodic failure to respond to written & verbal requests has led to a less than harmonious office environment." (*Id.*) [8]

---

8. This evaluation and recommendation was given final approval, presumably by the branch president, on September 1, 1993. (*See id.*) This particular performance evaluation, however, gives no indication of the date upon which plaintiff received notice or a copy of same. (*See id.*) All other performance evaluations contained in this record are signed and dated by Tipp, presumably on the date she was notified of the appraisal and discussed same with her supervisor. (*See,*

16. October 11, 1993 marked plaintiff's last day of work at AmSouth (*id.*, Tipp depo., at 133); she applied for long-term disability leave on that date and this application was approved in January of 1994 (*see id.*, at 134).[9] For a period of two years, until January of 1996, Tipp was paid sixty percent (60%) of her salary by Prudential, AmSouth's disability carrier, for a stated disability of "nerves[.]" (*Id.* at 134–136)

17. On February 25, 1994, plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) alleging sexual harassment and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (*See* Doc. 54, Exhibit 1)[10] Tipp's attachment to the EEOC discrimination charge reads in its entirety as follows:

I. During my employment in the Natural Resources Dept. and after the employment of Markel R. Wyatt as mineral manager, I endured continuous abuse which was both verbal and vulgar. This behavior was known to Tom Gause, who at that time was Wyatt's superior. Wyatt's behavior and personal verbal attacks were reported to Tom Gause and Joe Baker in a written complaint by Tom Gause's personal secretary, Nancy Mosley, after Wyatt had verbally attacked her. He verbally attacked Shelia Smith, in the Investment Dept., and physically upset her to tears. Smith's superior personally "visited" Wyatt and told him it would never happen again. Wyatt would threaten to fire me every day. I was continuously having to go down the hall to recover from crying.[11]

II. Wyatt's behavior persisted despite the knowledge of his behavior by his superior and the personnel department.

III. During the Anita Hill—Clarence Thomas hearings, Wyatt, in the presence of Brenda Stewart, told me that I should sue the bank on harassment charges against Greg Wittendorfer. At that time Wittendorfer had never done anything offensive to me. After Feb. 1992, when I began to report to Wittendorfer, he became unbearable. When I had physical illnesses he said they were "in my head" and that I needed therapy. He became outraged because of an appointment to have a mammogram. Wittendorfer stated that I was a hypochondriac. I informed him of fibric (sic) cysts and the fact that the doctor required these tests due to high risks.

IV. Also, Wittendorfer told me that I was frigid, called me a bitch and told Brenda Stewart to save her green M & M's for me because they were supposed to make me horny.

V. In July, 1992, Wyatt verbally berated Brenda Stewart and Debbie Baker. It was reported to Tom Gause who did nothing. Stewart wanted to go to the personnel department and wanted me to

---

e.g., Doc. 54, Exhibit 14 (1990 performance evaluation)) In fact, at some point during plaintiff's employment with the defendant her review month became September of each year and though the evaluators · performed their review in August, Tipp signed each review in September. (*See id.* (Signed by Tipp on September 17, 1990); Exhibit 13 (signed by Tipp on September 14, 1989); Exhibit 4 (signed by Tipp September 17, 1992)) Therefore, the undersigned has no clue from the document itself when Tipp was notified that her performance was unacceptable and that she would be placed on probation other than the fact that the evaluation and probationary term were not given final approval until September 1, 1993. (*See* Doc. 84, Marian Tipp Affidavit ("[I]t was impossible that I received my evaluation any earlier than September 1, 199[3].'"))

9. Tipp was diagnosed with post-traumatic stress disorder by Dr. Elise Labbe. (Doc. 54, Exhibit 22, Marian Tipp's Affidavit)

10. Tipp left the EEOC charge with an attorney on February 8, 1994 (*id.*, Tipp depo., at 10; *see also id.*, Exhibit 1 (Tipp and notary signed the charge on February 8, 1994)), and it is clear to the undersigned that this unknown attorney simply forwarded the charge to the EEOC in late February, 1994.

11. Tipp testified that Wyatt's hollering, etc., often unnerved her to the point that she would cry for as long as one hour or more in a single day. (Doc. 54, Tipp depo., at 130 & 133)

go with her. I did not want to go for fear of losing my job. Stewart told me that they all thought I needed therapy. After hearing that, and knowing there was nothing that Gause or Stough would do, I went to the personnel department. We talked to Marcella Sims who told us there needed to be a written complaint. Sims said Dinson Franklin, the personnel manager in Birmingham would "personally" investigate. I did not want to file a grievance report which would go through Vaughn Stough. Sims said that Franklin handled these things personally.

VI. A grievance was filed, in which I stated that in the past Wyatt had slapped me on the buttocks, accused me of having sex with my horse and that a computer was like sex for me. I related that I had worked overtime but did not receive pay for it and an occurrence where my pay was docked for coming in late after being in Auburn at the Veterinary Clinic.

VII. After Stough's "investigation" he said that we would have to make things work together and that there would be other arrangements made if we did not. He told us there would be no more sexual comments. Wyatt denied the allegations against him and said I didn't know how to take a joke. Wyatt said he was unaware of missed overtime pay and any docking of my pay. Over the phone I later tried to tell Stough that this was not true. Stough reminded me of what would happen if I didn't give it up. Later, he admitted that he had believed what I said, while still supporting Wittendorfer and Wyatt.

VIII. Wyatt tried to coerce my resignation earlier in the summer of 1993 by finding me positions in the help wanted ads that he thought would be suitable for me. One was at Michael's Craft Store in accounting. Later, when the bank offered an early retirement package he told me I should take early retirement.

IX. There was intentional harassment later. The day of the Amtrak derail-ment, after going to lunch together, Wyatt and Wittendorfer came back telling me to run over to the Riverview, because they were bringing in dead bodies. I told them that I didn't think that was funny, that it could have been their families. The next day I received a negative performance review by Tom Gause, Mark Wyatt and Greg Wittendorfer. They informed me that everything was "documented." I was repeatedly harassed for personal calls, even if it was a business call. When I tried to take a break or lunch to make a personal call, they would always come to interrupt, sometimes kicking open the door of the conference room.

X. AmSouth Bank N.A. is responsible for the continuance of harassment and abuse because they were aware of these actions for years, and after a grievance was filed Stough failed to do a complete investigation by refusing to talk to witnesses named in the report: Neil Sizemore, Debbie Baker, Pat Palmer and Betty Passell.

XI. In retaliation for filing my grievance report, I have been deemed an unacceptable employee by my employers.

XII. INJURIES: Severe mental injury and anguish resulting from the abuse. Manifestations include inability to handle personal finances, hair loss and baldness, chronic fatigue, severe chronic insomnia, heart murmurs, irregular heart beat, lower immune defenses caused by stress, and hyperventilation which caused tingling sensation throughout my body on my right side and mental disorientation.

(*Id.* (footnote added)) The EEOC's district office in Birmingham ordered that AmSouth Bank respond to Tipp's charges by March 24, 1994. (*See id.,* NOTICE OF CHARGE OF DISCRIMINATION)

18. On August 10, 1995, the EEOC issued its determination based upon its investigation of the charge. (*Id.,* Exhibit 2) The Commission was unable to conclude

that the information obtained in its investigation established violations of Title VII of the Civil Rights Act of 1964, as amended. (*Id.*) The Commission informed plaintiff of her right to sue. (*Id.*) The EEOC's determination reads in its entirety as follows:

> On behalf of the Commission, I issue the following determination based on the Commission's investigation of this charge. All requirements for coverage have been met. The investigation covered the allegations of the charging party that she may have been discriminated against in violation of Title VII of the Civil Rights Act of 1964, as amended, because of her sex (female) and in retaliation for having engaged in a protected activity, in that she was harassed.
>
> Based upon the Commission's investigation, the Commission is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No findings are made as to any other issues that might be construed as having been raised by this charge.
>
> This determination and dismissal concludes the processing of this charge. This letter will be the only notice of dismissal and the only notice of the Charging Party's right to sue which will be sent by the Commission. FOLLOWING DISMISSAL, THE CHARGING PARTY MAY ONLY PURSUE THIS MATTER FURTHER BY FILING SUIT AGAINST THE RESPONDENT(S) NAMED IN THE CHARGE IN FEDERAL DISTRICT COURT WITHIN (90) DAYS OF THE CHARGING PARTY'S RECEIPT OF THIS LETTER. Therefore, if a suit is not filed within this 90 day period, the Charging Party's right to sue will be lost.
>
> (*Id.*)

19. On November 8, 1995, plaintiff filed suit *pro se* against AmSouth, alleging a sexually hostile work environment and retaliation. (Doc. 1)[12] Although plaintiff initially appeared in this case *pro se*, she first contacted an attorney (who actually filed the EEOC charge on her behalf) in October or November of 1993. (*See* Doc. 54, Tipp depo., at 10 & 18)

20. In January of 1996, after plaintiff had received her last disability payment, she contacted AmSouth's Human Resources Department about returning to work. (*See id.,* at 136–137) Plaintiff met with Sonsherraye Gowder from AmSouth Human Resources in Mobile on February 6, 1996. (*See id.* at 139–140 & 143) During that meeting, plaintiff refused to consider any job located in the same building where she previously had worked, that is, the downtown branch of AmSouth, even though Gowder informed her that the bulk of the Bank's jobs were located in this building. (*Id.,* at 141–142)[13] Plaintiff also inquired about the availability of unemployment benefits and/or severance packages. (*Id.* at 142) Plaintiff subsequently sent a letter to Ms. Gowder reiterating her interest in unemployment compensation or a severance package. (Doc. 54, Exhibit 3 ("I inquired of the severance package and unemployment benefits that were made available to other employees. You were to discuss with Fred Rogan, giving him my report for duty as provided by my physician, and let me know. Please provide me with this information as soon as possible.")) Although clearly plaintiff still considers herself to be an AmSouth employee (Doc. 54, Tipp depo., at 143), she steadfastly refuses to accept a job in any part of the

---

12. In the complaint, Tipp averred that on October 11, 1993 she was forced to take a medical leave of absence for job-related stress brought about by "verbal comments contained over sexual innuendo directed at and about plaintiff, and sexually-oriented physical touchings by male supervisors to include but not necessarily limited to Markel R. Wyatt and Greg Wittendorfer." (*Id.,* ¶¶ 8–9)

13. Growder mentioned the availability of part-time teller positions but Tipp told her that she could not make her payments on part-time teller work. (*See id.,* at 140 & 142)

Bank's administrative complex in downtown Mobile (*id.* at 144 (in response to attorney's question about whether plaintiff would be willing to take a secretarial job on a different floor from where she worked plaintiff replied that she did not want to put herself in that position and would rather not take such a job but rather wanted a similar job at another office)).

21. On April 19, 1996, plaintiff filed an Amended Complaint to include claims of constructive discharge as well as state law claims of invasion of privacy and negligent and/or wanton hiring and retention and/or training and supervision. (Doc. 16; *see also* Doc. 23) On July 2, 1997, the Court entered an order and a judgment in favor of AmSouth Bank on plaintiff's claims of sexual harassment (including hostile work environment), constructive discharge, invasion of privacy, and negligent and/or wanton hiring, training, and/or supervision and retention. (Docs. 61 & 62) [14] The claims remaining against AmSouth, which are now the subject of the present motion for summary judgment, are hostile work environment as it pertains to gender and retaliation. (*See* Doc. 61)

22. In answer to the amended complaint (Doc. 25), and also in the original answer (Doc. 3), the defendant asserted as an affirmative defense that "[p]laintiff's claims are barred for failure to exhaust administrative prerequisites to filing suit."

23. At her deposition on August 2, 1996, Tipp testified that Wyatt hollered and cussed at other women employees but that if he ever yelled, screamed, and cussed at male employees she did not witness such outbursts. (*See* Doc. 31, Tipp

depo., at 29 & 31) In her unsworn declaration, made pursuant to 28 U.S.C. § 1746, Brenda Stewart stated the following: "I feel that Mark Wyatt is a jerk but I think and truly believe that he is a jerk to everyone. I do not think that he singles out women or harasses women, but that he has a short-fuse for everyone, including men. I never witnessed nor do I have any knowledge of Mark Wyatt intentionally harassing anyone on account of their sex. Greg Wittendorfer can also be a jerk, but he is a jerk to everyone, men and women." (Doc. 54, Exhibit 21; *see also id.*, Exhibit 20 (in her declaration, Pat Palmer relates that "Greg Wittendorfer and Mark Wyatt treat everyone the same, sometimes they lose their temper but they have been helpful to me in my job"); Exhibit 19 (in her declaration, Ledrester Collins states that she does not "believe that men are treated better or any differently than women in my department"))

## CONCLUSIONS OF LAW

### A. SUMMARY JUDGMENT STANDARD.

1. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)

---

**14.** On August 26, 1997, this Court denied plaintiff's motion to set aside the judgment (Doc. 67) and revised motion to set aside the judgment (Doc. 71), based upon the reasons set forth in the defendant's response. (Doc. 77) Since that time, plaintiff has filed a motion for reconsideration of her motion to set aside judgment in favor of AmSouth (Doc. 109), the defendant has filed its opposition to the motion for reconsideration (Doc. 114), the plaintiff has filed a total of three sets of objections to the defendant's opposition (*see* Docs. 116, 118 & 122) and a supplement to the

motion for reconsideration of the motion to set aside (Doc. 126), and the defendant has filed a response to the plaintiff's supplement (Doc. 127). After due consideration, it is **ORDERED** that plaintiff's motion for reconsideration of her motion to set aside (Doc. 109) and her supplement to the motion for reconsideration of the motion to set aside (Doc. 126) are **DENIED** for the reasons set forth in AmSouth's responses (Docs. 114 & 127; *see also* Doc. 72 (defendant's initial reply to plaintiff's motion to set aside summary judgment)).

("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.").[15] The clear language of Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex, supra,* 477 U.S. at 322, 106 S.Ct. at 2552. A complete failure of proof by the non-movant on an element essential to his case renders all facts immaterial, so the movant is entitled to judgment as a matter of law. *Id.* at 323, 106 S.Ct. at 2553.

2. At the summary judgment stage, the court's function is not to weigh the evidence to determine the truth of the matter, but to determine whether a genuine issue exists for trial. (citation omitted) A genuine issue for trial exists only if sufficient evidence is presented favoring the nonmoving party for a jury to return a verdict for that party. (citation omitted) When assessing the sufficiency of the evidence in favor of the nonmoving party, the court must view all the evidence, and all factual inferences reasonably drawn from the evidence, in the light most favorable to the nonmoving party. (citation omitted) The court is not obliged, however, to deny summary judgment for the moving party when the evidence favoring the nonmoving party is merely colorable or is not significantly probative. (citation omitted)

*Raney v. Vinson Guard Service, Inc.,* 120 F.3d 1192, 1196 (11th Cir.1997) (citations omitted); *see also Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997) ("An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the out-come of the case. . . . 'It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party.' ").

**B. *Retaliation.***

■■■ 3. In Alabama, a non-deferral state, a plaintiff must file a Title VII discrimination charge with the EEOC within 180 days of the alleged violation. 42 U.S.C. § 2000e–5(e). "Failure to file before this time elapses requires the court to dismiss a subsequent lawsuit as untimely." *Quillen v. American Tobacco Co.,* 874 F.Supp. 1285, 1292 (M.D.Ala.1995) (citation omitted). Thus, a prerequisite to the maintenance of a Title VII action is the timely filing of a charge with the EEOC. *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 555 n. 4, 97 S.Ct. 1885, 1887 n. 4, 52 L.Ed.2d 571 (1977); *see Mitchell v. Jefferson County Bd. of Educ.,* 936 F.2d 539, 543 (11th Cir.1991) (Title VII requires that a charge be filed within 180 days of the alleged discriminatory act). While the requirement that an EEOC charge be timely filed is not jurisdictional in nature, *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982) ("We hold that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."), the requirement is a condition precedent to the maintenance of an action, and the plaintiff bears the burden of demonstrating that the conditions precedent have been satisfied once the defendant " 'specifically and with particularity' " denies that the preconditions have been fulfilled, *Jackson v. Seaboard Coast Line R.R. Co.,* 678 F.2d 992, 1010 (11th Cir.1982).

■■■ 4. Although plaintiff's EEOC charge is rather lengthy, involving more than two pages of attached allegations

---

**15.** The substantive law will identify which facts are material. 477 U.S. at 248, 106 S.Ct. at 2510. The Supreme Court concluded in *Anderson* "that the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Id.* at 255, 106 S.Ct. at 2514.

rather than the traditional one-block entry on the form itself, at no point in those allegations does plaintiff ever mention a medical leave of absence, let alone contend that she was forced to take such leave in retaliation for filing an internal complaint of sexual harassment. In fact, plaintiff's only mention of retaliation is in paragraph XI, wherein she charges that "[i]n retaliation for filing my grievance report, I have been deemed an unacceptable employee by my employer."

5. In light of the foregoing, the Court agrees with the defendant that when Tipp filed her charge of discrimination with the EEOC, she viewed her 1993 Annual Performance evaluation as retaliatory. However, the undersigned cannot agree with the defendant that the evaluation can be looked to as the "alleged unlawful employment practice" on August 4, 1993, when Wyatt and Wittendorfer signed same, as opposed to the date upon which it was given final approval, September 1, 1993, September being plaintiff's review month, and/or the date upon which Tipp was notified that her job performance was unacceptable, a date which has not been established to this Court's satisfaction. (*See* Doc. 84, Tipp Affidavit (stating it was impossible that she received her evaluation any earlier than September 1, 1993)) If September 1, 1993, or a later date, is regarded as the date of the unlawful employment practice, rather than August 4, 1993,[16] only 178 days passed between this date and the date plaintiff filed her EEOC charge,[17] making her charge timely filed. Accordingly, the Court finds a material dispute of fact which prevents a grant of summary judgment in this regard.

■ 6. Under Title VII, it is an unlawful employment practice for an employer to discriminate against an employee "because [she] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). A plaintiff alleging Title VII retaliation must show the following to establish a prima facie case: "(1) a statutorily protected expression; (2) an adverse employment action; and (3) a causal link between the protected expression and the adverse action." *Raney, supra,* 120 F.3d at 1196.

Once the plaintiff has established a prima facie case of retaliation, "the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." *Hairston,* 9 F.3d at 919. If the defendant proffers legitimate reasons, the presumption of retaliation is rebutted and drops from the case. At the summary judgment stage, the burden then shifts back to the plaintiff to raise a genuine factual issue as to whether the defendant's proffered reason is a pretextual ruse to mask a retaliatory action. *See Hairston,* 9 F.3d at 921 ("The burden to avoid summary judgment is not to show by a preponderance of the evidence that the stated reasons were pretext. Rather plaintiff's burden ... is met by introducing evidence that ... could allow a jury to find ... that the plaintiff has established pretext, and that the action was taken in retaliation for engaging in the protected activity.").

*Id.* at 1196–1197.

7. With respect to the prima facie case issue, the undersigned finds, as admitted by the defendant, that plaintiff's internal complaint did constitute Title VII protected activity. Moreover, the Court finds that genuine issues of material fact exist which prevent the Court from determining on summary judgment that plaintiff's disability leave was not an adverse employment action and that there is no causal link

---

**16.** The defendant, of course, prefers the date of August 4, 1993, because if this date was looked to a total of 205 days would have elapsed between the unlawful employment practice date and February 25, 1993.

**17.** In reaching the 178 total, the undersigned has included September 1, 1993.

between her complaint and her disability leave.[18]

■ 8. The Eleventh Circuit has set forth guidelines for establishing a claim of discriminatory constructive discharge. Applying those guidelines to plaintiff's claim of constructive imposition of medical leave, a plaintiff must first show " 'that [her] working conditions were so difficult or unpleasant that a reasonable person would have felt compelled' " to take medical leave. *Hill v. Winn–Dixie Stores, Inc.*, 934 F.2d 1518, 1527 (11th Cir.1991), quoting *Wardwell v. School Bd. of Palm Beach County, Florida*, 786 F.2d 1554, 1557 (11th Cir.1986). Before a finding of constructive discharge/imposed medical leave can be established, the Eleventh Circuit "has traditionally required a high degree of deterioration in an employee's working conditions, approaching the level of 'intolerable.' " *Hill, supra.* While an essential element of a constructive discharge claim is an involuntary resignation, *see Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 905 (11th Cir.1988), "[a] constructive discharge may be found on the basis of evidence that an employer deliberately sought to place an employee in a position that jeopardizes his or her health." *Spence v. Maryland Casualty Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993).

■ 9. The Court finds that plaintiff has created a fact question regarding whether her working conditions were so intolerable that she was forced to take medical leave in October of 1993. Plaintiff asserts that after she filed her complaint of sexual harassment and an investigation had occurred, Wyatt intentionally retaliated against her by (1) frequently using profanity while yelling and screaming at her in the work place, (2) implementing unreasonable job restrictions and requirements not placed on similarly-situated employees, (3) repeatedly using demeaning and derogatory comments, and (4) mentally and emotionally abusing plaintiff to force her to resign. (Doc. 16, ¶ 17) While the defendant has termed these allegations conclusory, they are not without basis in the evidence of record. As aforesaid, plaintiff testified that Wyatt's use of profanity and derogatory comments continued after the investigation, albeit in a more subtle and secretive manner, Wyatt telling her on one occasion just prior to the date she took leave that he asked her for a file not her "fucking memory." Moreover, given plaintiff's complaints to the EEOC regarding Wyatt's explicit suggestion that she take early retirement and implicit suggestions that she consider another job, along with her unacceptable evaluation and the deposition testimony regarding threats to dock her pay and kicking the conference room door while she lunched,[19] a jury question exists regarding whether a reasonable person would have felt, as Tipp certainly did, compelled to take medical leave. Moreover, as indicated in *Garner v. Wal–Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir.1987), Tipp's failure to complain to supervisory personnel of the continuing abuse being meted out by Wyatt merely impacts upon a jury's, or fact finder's,[20] consideration of whether her action

**18.** The Court is undecided at this time whether plaintiff can attempt to prove her claim of retaliation by relying on the 1993 evaluation as the unlawful employment practice and therefore, on this basis alone, summary judgment on the prima facie case issue should be denied.

**19.** The defendant contends that this conference room incident did not occur after the internal investigation inasmuch as plaintiff's testimony linked the kicking to surgery she had and the deposition testimony reveals that she had glandular surgery in 1983 or 1984 (Doc. 54, Tipp depo., at 163) and throat surgery in 1974 (*id.* at 166). However, Tipp's

affidavit establishes that this incident occurred in September of 1993, after a surgical procedure performed in August of 1993 (Doc. 84), and because the defendant did not provide this Court with the entirety of plaintiff's deposition testimony regarding her medical history, the Court finds an obvious dispute of fact regarding this particular incident.

**20.** *See Young v. Mariner Corp.*, 1991 WL 172927, * 1, *32 (N.D.Ala.1991) (following a bench trial over the course of several days, trial judge found that plaintiff acted unreasonably by failing to complain about what she considered retaliation and therefore, did not

in taking leave was reasonable but certainly does not establish that she acted unreasonably given the fact that she had previously complained and an investigation had resulted in at least an implicit finding that Wyatt was verbally abusive to Tipp.

10. Turning to the final prong of the prima facie case, causal link, the Court notes that the Eleventh Circuit has interpreted this prong broadly, *EEOC v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571–1572 (11th Cir.1993); "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Meeks v. Computer Associates Int'l*, 15 F.3d 1013, 1021 (11th Cir.1994) (citation omitted). In *Sneed v. Montgomery Housing Authority*, 956 F.Supp. 982, 987 (M.D.Ala.1997), *aff'd*, 136 F.3d 1331 (11th Cir.1998), a case in which a non-jury trial was held on two separate days, the court stated that "[t]he causal connection can be established by the timing of the adverse employment decision, by evidence that the defendant departed from its normal practices, or by evidence that the defendant took steps to conceal the reason for its adverse employment action." In following *Meeks*, and in recognition that *Sneed* was not decided on motion for summary judgment, the Court finds that the protected activity in this case and plaintiff taking medical leave are not wholly unrelated because the evidence, when viewed in the light most favorable to the plaintiff, establishes that Wyatt's untoward conduct continued up until the time plaintiff took leave, the implicit suggestions about other work and explicit recommendation that she take early retirement coming in the summer of 1993, the kicking incident coming in early September of 1993, and the "fucking memory" and Amtrak comments apparently occurring sometime later than these other events.

11. The defendant argues that even if plaintiff establishes a prima facie case of retaliation, it has offered—and plaintiff has

give her employer a realistic chance and a reasonable period of time to resolve what she

conceded—a legitimate, non-discriminatory reason for its conduct, that is, plaintiff's unacceptable performance. The defendant's argument is as follows: "Although plaintiff has asserted that Mr. Wyatt stated that he might dock her pay, she has admitted that at the time she was performing unauthorized work during her working hours (Pl.Depo. Pp. 75–76). Plaintiff has produced no evidence that Mr. Wyatt's response was based on anything other than her inappropriate conduct. Because she cannot rebut the reason for Mr. Wyatt's action as pretextual and in fact concedes that the reason given is true, her claim must be dismissed." As previously established, plaintiff has averred much more than just that Wyatt threatened to dock her pay and therefore, even if the defendant is correct that the docking of pay comment was based solely upon plaintiff's unacceptable work performance, this does not establish a legitimate nondiscriminatory reason for all of Wyatt's inappropriate comments and actions toward Tipp between the time the investigation occurred and October of 1993 when she took medical leave.

12. In light of the foregoing, the Court denies defendant's motion for summary judgment on plaintiff's retaliation claim.

### C. *Gender Harassment.*

13. The Court cannot agree with the defendant that plaintiff's claim of gender harassment must fail because she did not file a timely charge with the EEOC. As stated above, in Alabama a plaintiff must file a Title VII discrimination charge with the EEOC within 180 days of the alleged violation. 42 U.S.C. § 2000e–5(e). It is plaintiff's contention that because plaintiff filed her EEOC Charge on February 25, 1994, the conduct forming the basis of that Charge must have occurred no later than August 30, 1993 and further, that plaintiff's claim is clearly untimely since she "has not

perceived to be a problem with retaliation).

alleged a single specific incident of harassment occurring between August 30, 1993 and the beginning of plaintiff's disability leave on October 11, 1993 except, arguably, Mr. Wyatt's comment about docking her pay, an event to which she ascribes no specific date[.]" However, the Court finds the defendant's argument in this regard foreclosed by plaintiff's affidavit testimony that the kicking incident occurred in September of 1993, her deposition testimony that just prior to the time she took leave Wyatt made his "fucking memory" comment, and by the reasoning in *Quillen, supra,* 874 F.Supp. at 1292.

There is an exception to the 180–day filing, requirement, however, where the actions by an employer are part of a pattern of discrimination such that they constitute a continuing violation. Under this doctrine, actions that took place more than 180 days prior to an EEOC filing may in some instances be included in the plaintiff's claim. *Calloway v. Partners Nat'l Health Plans,* 986 F.2d 446, 449 (11th Cir.1993)[;] *Beavers v. American Cast Iron Pipe,* 975 F.2d 792, 796 (11th Cir.1992). In determining the existence of a continuing violation, the court looks to several factors, including the subject matter of the discrimination, the frequency of the acts, and the permanence of the decision. *Roberts v. Gadsden Memorial Hospital,* 835 F.2d 793, 800–801 (11th Cir.1988).

In this case, it is clear that the plaintiff's allegations fall under the category of continuing violation and are therefore not time barred. Although it is true that most of the events that created the hostile work environment occurred outside of the 180 day period, this overlooks the nature of the hostile work environment cause of action.

Plaintiff has alleged that the behavior of the defendant and defendant's agents resulted in a workplace that was unbearable. That plaintiff points to no one particular act by defendant within the 180 day period is not relevant. If proven, the alleged conditions under which plaintiff worked violated Title VII. Therefore, under the allegation of a hostile work environment, on each day plaintiff went to work there existed a violation of anti-discrimination law.

*Id.*

■ 14. "A plaintiff asserting a hostile work environment claim must prove the following four factors to establish a prima facie case of gender-based discrimination: (1) the plaintiff belongs to a protected group; (2) the plaintiff was subjected to unwelcome harassment; (3) the harassment complained of was based on the plaintiff's gender; and (4) the harassment was sufficiently severe or pervasive so as to alter the conditions of the plaintiff's employment.[21] ... In addition, the plaintiff must prove that the employer knew or should have known about the hostile atmosphere, but failed to take appropriate remedial steps." *Gowens v. Springs Industries, Inc.,* 1997 WL 866614, * 8 (N.D.Ga. 1997) (footnote added); *see Ballard v. Alabama,* 1996 WL 316761, * 12 (S.D.Ala. 1996) ("To prove a prima facie case of racially or sexually harassing hostile work environment, Ballard must establish: (1) she belongs to a protected class; (2) she was subjected to unwelcome racial or sexual harassment; (3) the harassment was based on race or gender; (4) the harassment affected a term, condition, or privilege of employment; and (5) respondeat superior.").

■ 15. The Court finds that there are genuine disputes of material fact which prevent the Court from granting summary judgment to the defendant on plaintiff's claim of hostile work environment on account of gender. Clearly, plaintiff belongs

---

**21.** "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' ... that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' ... Title VII is violated." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (citations omitted).

to a protected group as she is a woman. Second, the undersigned finds a dispute of fact regarding whether plaintiff was subject to unwelcome harassment. A jury could certainly believe that the use of vulgar and derogatory comments, yelling and screaming, kicking doors, threatening loss of pay, explicit suggestions about taking early retirement, and implicit suggestions about looking for another job, amount to unwelcome harassment.

16. Turning to the third prong of the prima facie case, the Court finds that a plaintiff can prove by direct or circumstantial evidence that the harassment was based on gender. *Gowens, supra,* at * 9. The record in this case reveals no direct evidence that Wyatt's conduct toward Tipp was based on gender. Direct evidence would be statements by Wyatt that "It's just like a woman to run her mouth on the phone all day and then to cry when I get upset," and the like. Because there is no direct evidence like this in the record, the Court need only decide whether there is any circumstantial evidence of Wyatt's gender-based discrimination. In this regard, the undersigned finds that the defendant has not established that there is no genuine dispute of material fact. All the record contains is innocuous beliefs by some AmSouth employees that Wyatt treated "everyone the same[,]" was a jerk to everyone, and did not "intentionally harass anyone on account of their sex[ ]" versus the cogent testimony of the plaintiff that Wyatt yelled, hollered and cursed not only at her but also other women and that if he ever yelled, screamed and cursed male employees she did not witness such outbursts. Based on the type and quality of the evidence before this Court to date,[22] the undersigned finds that the evidence of record allows a reasonable inference that Wyatt's conduct was motivated by Tipp's gender.

17. The fourth prong of the standard is that the harassment must be sufficiently severe or pervasive so as to alter the condition of the plaintiff's employment.

> But we can say that whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Harris, supra,* 510 U.S. at 23, 114 S.Ct. at 371. Given plaintiff's allegations and testimony that Wyatt's abusive language and conduct reduced her to tears on numerous occasions[23] and eventually forced her to take a medical leave of absence, whereupon she immediately sought psychiatric care and was diagnosed with post-traumatic stress disorder, the undersigned finds that a jury must determine whether Tipp was subject to an abusive working environment.

18. Finally, the plaintiff must prove that AmSouth knew or should have known about the hostile atmosphere, but failed to take appropriate remedial steps, inasmuch as it is plaintiff's contention that the defendant is due to be held liable "for its own negligence or recklessness, but not for the conduct of its supervisors or employees." *Faragher v. City of Boca Raton, Florida,* 111 F.3d 1530, 1534 (11th Cir.), *cert. granted,* 522 U.S. 978, 118 S.Ct. 438, 139 L.Ed.2d 337 (1997); *see also id.*

---

22. The defendant had the perfect opportunity here to submit the declaration of a male employee who had been the focus of one of Wyatt's outbursts but for whatever reason chose not to submit such evidence.

23. A reasonable inference from such evidence is that the time it took to regain her composure, as long as one hour according to the testimony, would constitute an unreasonable interference with her work performance.

at 1535–1536 (discussing the difference between direct and indirect liability with regard to a hostile work environment claim). "The employee can show that the employer knew of or should have known of harassment by proving either that she complained to higher management of the problem or that the harassment was so pervasive as to infer constructive knowledge on the part of higher management." *Reynolds v. CSX Transp., Inc.*, 115 F.3d 860, 866–867 (11th Cir.1997) (citation omitted). It is clear, at least at this point in the litigation of this claim, that it is plaintiff's position that AmSouth knew of the harassment because she complained to higher management about the harassment.[24] The pivotal question for summary judgment, therefore, becomes whether AmSouth took prompt "remedial" action after receiving Tipp's complaint, that is, "action ' "reasonably likely to prevent the misconduct from recurring." ' " *Id.* at 867 (citations omitted). " ' "What is appropriate remedial action will necessarily depend on the particular facts of the case—the severity and persistence of the harassment, and the effectiveness of any initial steps." ' " *Id.* (citations omitted). The Court finds that a genuine issue of material fact exists on the issue of whether AmSouth took action after receiving Tipp's complaint reasonably calculated to end the harassment. There is no evidence that Wyatt was reprimanded, issued a warning, or told that any future harassment would result in demotion or suspension, etc.; rather, all the evidence shows is that Wyatt admitted losing his temper on one occasion and promised to work on not losing his temper. Therefore, if plaintiff is successful on the remaining prongs of her prima facie case and can establish that the harassment continued, based on this evidence she will be able to demonstrate that the defendant did not take prompt remedial action. Accordingly, defendant is due to be denied summary judgment on plain-

tiff's claim of hostile work environment as it pertains to gender.

## CONCLUSION

The Court finds that AmSouth's renewed motion for summary judgment on Tipp's claims of retaliation and hostile work environment as it pertains to gender is due to be and hereby is **DENIED**.

---

**24.** One of this Court's findings of fact is that though plaintiff's written complaint in July, 1992 was primarily about Wyatt sexually harassing her it was also made clear to higher management at AmSouth that Wyatt was having outbursts of yelling, screaming and cursing.