**Beverly SNEED, Plaintiff,**

v.

**MONTGOMERY HOUSING AUTHORITY, Defendant.**

**Civil Action No. 95–C–401–N.**

United States District Court,
M.D. Alabama,
Northern Division.

Feb. 5, 1997.

Neva C. Conway, Millbrook, AL, for Beverly Sneed.

Michael Baird Beers, Michael S. Jackson, Beers, Anderson, Jackson & Smith, P.C., Montgomery, AL, for Montgomery Housing Authority.

## *MEMORANDUM OPINION*

CARROLL, United States Magistrate Judge.

### I. INTRODUCTION AND PROCEDURAL HISTORY

The plaintiff, Beverly Sneed, filed this action pro se under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5 et seq. on March 23, 1995. Present counsel entered an appearance on June 30, 1995. In this action, the plaintiff complains that she was the victim of sexual harassment by a female supervisor, that she was retaliated against by management for reporting the sexual harassment, and that she was the victim of discrimination based on her gender. A non-jury trial was held on April 30, 1996 and June 24, 1996. The court will discuss each of the plaintiff's claims in turn.

### II. FACTS

The plaintiff, Beverly Sneed, was employed at the Montgomery Housing Authority in June 1984. By 1990, she had been reclassified as an assistant housing complex manager. In September 1990, she was supervised by Ms. Carol Brown who was at the Smiley Court Housing Complex. Marva Tatum was the area manager who supervised Brown. The overall supervisor of all of the housing unit employees was Wiley Thomas, Jr. His official title was assistant executive director for housing management. Thomas reported directly to the Executive Director of the Montgomery Housing Authority.

The plaintiff and Ms. Brown had an apparently excellent working relationship until July 1992. In both 1990 and 1991, however, the plaintiff received a yearly evaluation which indicated problems with her attendance. The block on the evaluation form "Occasionally absent and frequently late" was checked. During the years 1990 and 1991, the plaintiff missed significant time from work because of her own personal illness and death in her family. The problem with excessive absences continued in 1992 but was less pronounced. The plaintiff consistently used up all of the leave time which she was allowed and was, therefore, forced to take days off as leave without pay.

The problems with Brown began, according to the plaintiff's testimony at trial, in July 1992. According to the plaintiff, Brown and a tenant at the Smiley Court Housing Complex named Glover were discussing lesbianism and lesbian activities. On days following this discussion, Brown, according to the plaintiff, put her arm around her shoulder and around her waist and ran her hand through her hair. The testimony is unclear as to exactly how often Brown would make these sort of advances. The plaintiff did testify that she told Brown not to touch her any further and that the incidents diminished

following that discussion. The plaintiff did relate another incident which occurred sometime prior to August 1992 where Brown put her arm around her in the bathroom.

The plaintiff's daughter was married on August 1, 1992. The plaintiff did not report for work on the Monday following her daughter's wedding. The plaintiff's failure to appear precipitated a letter from Wiley Thomas to the plaintiff dated August 5 about her attendance. The letter read as follows:

> I find it necessary to write to you regarding your work habits. Needlessly(sic) to say, I am very dissatisfied with your productivity. It is virtually impossible for you to perform at an acceptable level with such an excessive rate of absenteeism, as is reflected in your available leave record. If, however, your absenteeism is due to illness, I suggest you request a leave of absence through the Executive Director accompanied by a doctor's statement; or it may be due simply to a lack of interest and responsibility in your present assignment. I will accept your resignation.

> At any rate, if this pattern of job abuse continues, I will be forced to ask for your resignation and replace you with someone who is dependable and capable of producing at an acceptable level.

> I shall expect a written reply/explanation from you in this matter within the next week.

On the same day that Thomas mailed the plaintiff a letter about her tardiness, the plaintiff mailed Thomas a letter complaining that Brown had taken $30 from her pocketbook. She had not received his letter at the time she mailed hers. There was nothing in the letter which the plaintiff sent to Thomas on August 5 which would indicate that the plaintiff was having any difficulties of a sexual nature with Carol Brown. The letter simply complained that Brown had stolen money from her. The plaintiff received Thomas' letter on August 6, 1992 and wrote an immediate response. The response, which is dated August 7, 1992, was some three pages long. One paragraph of the three page letter concerns sexual harassment. According to the letter,

> while working in this environment I have encountered sexual advancement made toward me by female co-worker and if you would like to know more in details what I mean I will discuss them privately with you, I express to them that I did not like this type of activity and would they not do these type of things again. So I guess they did not like that and are after whatever they can get.

Some time after Thomas received the plaintiff's response, he assigned Otis Buford to the Smiley Court Housing Complex. Thomas testified that he assigned Buford to Smiley Court so that Buford could assist the plaintiff and Brown. According to Thomas, the performance of Brown and the plaintiff at Smiley Court was below standards. Buford was sent to replace Brown when she went on vacation and then remained so that the office was staffed by three rather than two people.

On August 24, the plaintiff was called to a meeting with Rudy Martinez, the director of personnel, and Thomas. At that meeting, the plaintiff was questioned about her excessive absenteeism and also about her allegations about sexual harassment. She told Martinez and Thomas that Brown put her arms around her waist and shoulder, held her while she was sitting at the typewriter, and placed something in her hair. According to Martinez, the plaintiff told him that the last incident of sexual harassment occurred in July 1992.

On September 1, Martinez, Thomas, and Marva Tatum met with Carol Brown to discuss the sexual harassment allegations. Brown categorically denied that she had made any sort of sexual advances toward the plaintiff or harassed her in any way. Other than meeting with Brown and the plaintiff, no one from the Montgomery Housing Authority conducted any further investigation of the sexual harassment charges. According to a memorandum about the meeting which Martinez placed in his file,

> I discussed sexual advancements allegations by Beverly and Carol denied them all. I strongly told her this was unacceptable for everyone at MHA and is treated seriously. I then told Marva that discussing religion was to stop.

On September 2, 1992, the plaintiff wrote a letter to Thomas requesting a transfer. She heard nothing from the request until November 18, 1992 when she was advised that she was being transferred to the Cedar Park Housing Project effective November 23, 1992. The manager of that complex was Dorothy Manzy.

The plaintiff reported for work on November 23 as directed. Immediately after she arrived at Cedar Park, she began having a dispute with the manager at that complex, Dorothy Manzy. The initial confrontation related to dates on the tenant leases. Apparently the straw that broke the camel's back was an incident involving how a monthly report was supposed to be filled out. Manzy did not like the way that the plaintiff had filled out the report and ordered her to do it over which angered the plaintiff.

On November 25, 1993, as a result of her conflict with Manzy, the plaintiff was called to a meeting with Thomas, Martinez, Manzy and Tatum. According to the plaintiff, she was attacked at this meeting particularly by Thomas who used profanity and said that he wanted to fire her. Thomas denies that he attacked the plaintiff during this meeting. Following the meeting, the plaintiff left and went to the city-county personnel board. She never thereafter returned to work. Two days later, she wrote the Executive Director of the Montgomery Housing Authority and complained about her treatment at the hands of Tatum and Thomas. She also wrote a formal letter of complaint to Thomas about Manzy. The letters concerning Tatum and Manzy reflect differences between the plaintiff and her supervisors concerning her job performance.[1]

The next work day was November 30, 1992. November 26 and 27 were Thanksgiving holidays. November 28 and 29 were Saturday and Sunday. The plaintiff did not return to work. On December 9, the plaintiff presented a note from Dr. Phillip Golomb indicating that she would be physically unable to work until January 3, 1993. On December 28, 1992, Richard Shinbaum, a Montgomery lawyer retained by the plaintiff, wrote a letter to the Executive Director of the Housing Authority. The letter read, in pertinent part

As you know, Mrs. Beverly Sneed has diabetes and stress is harmful to her condition. Mrs. Sneed believes that she has been harassed in the past by Mrs. Marva Tatum and now by Mrs. Manzy for several reasons including having in the past reported a higher level employee of the housing authority for embezzlement and now having complained concerning Mrs. Manzy which complaints partly arise out of the fact that Mrs. Sneed was more familiar with certain procedures of which Manzy was not aware.

In order to reduce her stress, Mrs. Sneed requests that she be allowed to transfer to Trenholm Court housing project or some other housing project which is not in Mrs. Tatum's area.

On January 4, 1993, the day after the note from Dr. Golomb indicated that the plaintiff was to return to work, the plaintiff did not return. On that same day, the executive director sent a letter setting a hearing for January 11, 1993 to address the matters referenced in the plaintiff's letters of November 27 and her counsel's letter of December 28. The plaintiff continued to be absent from work.

The hearing scheduled for the 11th did not take place because the plaintiff informed the executive director that she was ill. On January 14, 1993, Rudy Martinez received a letter from the plaintiff with a doctor's slip from Dr. Golomb indicating that he had been treating the plaintiff since January 6 and would continue to treat her until January 18. On the next day, January 15, 1993, the plaintiff's then-counsel, Richard Shinbaum, sent a letter by fax to the attorney for the housing community which states:

I have spoken with Ms. Beverly Sneed and she is agreeable to a transfer to the Tulane Court Housing Project, as we discussed in our telephone conversation earlier this week. It is my understanding that Mrs. Sneed should report to Tulane Court on Tuesday morning, January 19, 1993, since Monday is a holiday.

1. The executive director did not receive the letters until December 21, 1992.

If there is any formal agreement that you still needs (sic) to be executed, please let me know. This transfer will resolve the complaints contained both in my letter and Ms. Sneed's letter to Mr. Miller.

On January 19, 1993, the plaintiff did not appear at Tulane Court for work. At trial, she testified that her attorney was supposed to inform everyone that she was still ill and could not return to work. She also did not appear on the 20th, 21st, or 22nd. On the 22nd, Thomas sent a memorandum to the executive director requesting a dismissal hearing because of her failure to return to work. On January 26, 1993, the personnel officer sent a notice to the plaintiff which set a termination hearing for January 29, 1993 at 10:30 A.M. The plaintiff did not appear for work on the 27th or 28th. On the 29th, just prior to the hearing, she called and stated she was ill and could not attend. The hearing was then rescheduled for February 6, 1993. On February 3, 1993, the plaintiff sent a letter to the executive director resigning her position. In her words:

> I am writing to inform you that based on the condition that this firm cannot or will not provide me working conditions in which I am not being personally harassed, unsafe working conditions and that in which is not hazardous to my health and a threat to my life.

> Based on the conditional facts that I can only be granted a transfer out of personal harassing working conditions is that I would have to *sign a release and satisfaction of complaints and claims letter* and have it notarized in the present (sic) of a notary. Waive all my rights in *exchange for a transfer;* as per stated in the release & claim letter that granting such transfer would discharge all of my formal complaints and claims against the Montgomery Housing Authority, its officials, agents and employees, otherwise the transfer is not granted and I would have to continue to work under the same conditions. In which I declined to sign (emphasis in original).

The letter goes on to complain that she has been humiliated and harassed by Mrs. Tatum and Mr. Thomas and that this humiliation and harassment has caused her stress.

## III. DISCUSSION

### A. THE SEXUAL HARASSMENT CLAIM

■ The plaintiff, a female, claims that she was sexually harassed by her female supervisor Carol Brown. The elements that the plaintiff must satisfy in order to establish a case of sexual harassment depends on whether the type of harassment is quid pro quo or hostile environment. *See Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).[2] In this case, there are no facts which suggest "quid pro quo" sexual harassment.[3] Accordingly, the court will focus on the elements of a hostile environment claim.

■ In order to prevail on hostile environment sexual harassment claim, a plaintiff must prove, by a preponderance of the evidence, (1) that she belongs to a protected group, (2) that she was subjected to unwelcome sexual harassment, (3) that the harassment complained of was based on sex, (4) that the harassment complained of affected a "term condition or privilege" of employment in that it was sufficiently severe or pervasive "to alter the conditions of employment and create an abusive working environment," and (5) that the employer knew of the problem and failed to take prompt remedial action. *Sparks v. Pilot Freight Carriers,* 830 F.2d 1554, 1557 (11th Cir.1987) (quoting *Henson v. Dundee,* 682 F.2d 897, 903 (11th Cir.1982)); *see also Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1315 (11th Cir.1989). The court concludes, upon review of the evidence, that the plaintiff has failed to establish that she was subjected to hostile environment sexual harassment.

---

**2.** The court concludes, as has another judge in this district, that same-gender sexual harassment is actionable under Title VII. *See Prescott v. Independent Life and Accident Insurance Co.,* 878 F.Supp. 1545 (M.D.Ala.1995).

**3.** The plaintiff, for example, does not complain that Brown threatened her with adverse employment action if she did not succumb to her advances.

Other than the plaintiff's testimony, there is no evidence to support her claim. On the other hand, there is evidence which suggests that the plaintiff's claim is untrue. As a threshold matter, Carol Brown testified and categorically denied the plaintiff's charges. Martinez and Thomas testified that the allegations of same sex sexual harassment against Carol Brown were totally out of character with what they knew about her. Thomas had worked with both Brown and Sneed for years. Further, the timing of the plaintiff's charge of sexual harassment undermines its credibility. The plaintiff and Carol Brown worked together for some two years without difficulty. There was no alleged sexual harassment during this time period. According to the plaintiff, in July 1992, Carol Brown suddenly and for some unknown reason engaged her in a conversation about lesbian activities. Sometime after that, Brown allegedly placed her arm around the plaintiff's waist and on another occasion followed her into the bathroom and placed her arm on the plaintiff's shoulder.

On August 5, 1992, the plaintiff did write a letter to Wiley Thomas complaining about Carol Brown. The letter, however, followed closely on the heels of the plaintiff's failure to report for work on the Monday following her daughter's wedding. Interestingly enough, the letter mentioned absolutely nothing about sexual harassment. In the letter, the plaintiff accused Carol Brown of stealing $30 from her pocketbook on July 28. Nothing was said to management about any sexual harassment charges until Wiley Thomas indicated, by letter, that he was concerned about the plaintiff's excessive absenteeism. In response to that letter which essentially threatened her with termination for poor job performance, the plaintiff mentioned her charges of sexual harassment. The plaintiff had not previously mentioned the problem.

It is also important to note that the sexual harassment allegation was not mentioned by her counsel at that time. When her retained counsel wrote to the executive director in December 1992, he mentioned harassment by Mrs. Tatum and Mrs. Manzy but said nothing about Mrs. Brown or the failure of management to respond to the allegations of sexual harassment. The court concludes that the plaintiff has failed to carry her burden of proof on her sexual harassment claim.

## B. RETALIATION

Under the provisions of Title VII of the Civil Rights Act of 1964, it is an unlawful employment practice to discriminate against an employee because she has opposed any unlawful employment practice. The burden of proof in a Title VII retaliation case is governed by the same framework as the rest of Title VII. In order to prevail, the plaintiff must first prove that she

> (1) engaged in protected opposition to Title VII discrimination or participated in a Title VII proceeding; (2) was disadvantaged by an action of the employer simultaneously with or subsequent to such opposition or participation; and (3) that there is a causal connection between the protected activity.

*Morgan v. City of Jasper*, 959 F.2d 1542, 1547 (11th Cir.1992) (quoting *Whatley v. Metro. Atlanta Rapid Transit Auth.*, 632 F.2d 1325, 1328 (5th Cir. Unit B 1980)). The causal connection can be established by the timing of the adverse employment decision, by evidence that the defendant departed from its normal practices, or by evidence that the defendant took steps to conceal the reason for its adverse employment action. *Jordan v. Wilson*, 649 F.Supp. 1038, 1061 (M.D.Ala.1986). In the context of a trial involving a claim of retaliation, a court must go through a two step fact finding process. In the first step, the court must determine whether the employee has established, by a preponderance of the evidence, that the employee's protest against an unlawful employment practice was a motivating factor for the employer's decision. If the employee has established that fact by a preponderance of the evidence, then liability is established and the court must go to step two of the process. At step two, the court must determine whether the employer had proven by a preponderance of the evidence that it would have taken the same adverse employment action against the employee even in the absence of the impermissible factor. *Hearn v.*

*General Electric Company,* 927 F.Supp. 1486 (M.D.Ala.1996).[4]

█ In this case, the court concludes that the plaintiff has failed to prove that her complaints about alleged sexual harassment was a motivating factor in her discharge.[5] Plain and simply, there is no evidence to support her claim. The housing authority was considering the plaintiff's dismissal because of her excessive absenteeism prior to her complaint about sexual harassment. Indeed, the plaintiff had been counseled in 1990 and 1991 for being absent and being late. In August 1992, after her failure to return to work from her daughter's wedding, Wiley Thomas sent the plaintiff a letter concerning possible disciplinary action because of her absenteeism. The letter was sent and received by the plaintiff before the plaintiff complained about sexual harassment.

In addition, none of the correspondence from the plaintiff or her retained counsel mention possible retaliation. As noted above, after the meeting of November 25, 1992 which was called to discuss the conflict between her and her supervisor, Mrs. Manzy, the plaintiff wrote two letters to the executive director complaining about Thomas and Manzy. Neither of those letters mention anything about retaliation for complaining about sexual harassment. Further, her counsel's letter of December 28 specifically attributes the plaintiff's alleged "harassment" to her having complained about embezzlement by a higher level employee and having complained about Mrs. Manzy. There is no claim that she was being harassed because of her sexual harassment complaint. The court concludes, upon review of all of the evidence, that the plaintiff has failed to establish, by a preponderance of the evidence, that her complaint about sexual harassment was a motivating factor in the decision of the housing authority to take action against her because of her absenteeism.

## C. GENDER DISCRIMINATION

█ The plaintiff's original complaint contains a reference to gender discrimination as does her response to the defendant's summary judgment motion. The pretrial order does not contain a specific gender based complaint. In the interest of completeness, the court will address the complaint of gender based discrimination. The plaintiff complains she was the victim of gender-based discrimination because she was not transferred when she complained about Mrs. Manzy, whereas a male employee who complained about Mrs. Manzy was transferred.[6] As with other issues, the burden is on the plaintiff to establish her gender discrimination claim by a preponderance of the evidence. There was little serious attempt by the plaintiff to develop evidence about the transfer of Mr. McCall. Moreover, the plaintiff has failed to prove that the decision of management to attempt to work out the problems between her and Mrs. Manzy rather than transferring her had anything to do with her gender. The plaintiff has failed to establish that she was the victim of gender discrimination.

## IV. CONCLUSION

For the foregoing reasons, the court concludes that the defendant is entitled to judgment in its favor. A separate judgment will be entered accordingly.

---

4. *Hearn* was a gender discrimination case, but as noted above, general Title VII burdens of proof are applicable to retaliation claims, *see Quillen v. American Tobacco,* 874 F.Supp. 1285, 1294 (M.D.Ala.1995).

5. The plaintiff resigned her position but she contends that she was constructively discharged.

The court, for purposes of analysis, will accept the plaintiff's argument.

6. This is the allegation raised by the plaintiff in response to the defendant's summary judgment motion.