Amy EARLY, Plaintiff,

v.

MORRIS NEWSPAPER CORPORATION, Defendants.

No. Civ.A. 98–C–719–S.

United States District Court, M.D. Alabama, Southern Division.

July 1, 1999.

Charles Michael Quinn, Kyle T. Smith, Gordon, Silberman, Wiggins & Childs, Birmingham, AL, for Amy Early, plaintiff.

James Davis Farmer, Gary Clayborn Sherrer, Richard Martin Adams, Farmer, Farmer, Malone & Sherrer, P.A., Dothan, AL, for Morris Newspaper Corporation, defendant.

Elizabeth B. Glasgow, Farmer, Price, Hornsby & Weatherford, Dothan, AL, for Kenneth Henderson, defendant.

## MEMORANDUM OPINION

CARROLL, United States Magistrate Judge.

This matter is before the court for consideration of defendants' motions for sum-

mary judgment filed May 11, 1999 and set for submission June 14, 1999. In plaintiff's response to defendants' motions and at the pretrial conference on June 6, 1999, plaintiff advised the court that the only claims that she is pursuing are her causes of action under 42 U.S.C. § 2000e *et al.*, commonly referred to as Title VII, for sexual harassment and disparate treatment against her former employer defendant Morris Network of Alabama, Inc.[1] Accordingly, the court will limit its consideration of pending motion to those claims. For the reasons stated below, the court finds that motion is due to be granted in part and denied in part.

## I.

Plaintiff, Amy Early, began her employment with defendant Morris Network[2] in September, 1996, shortly after graduating from college. She worked at a television station in Dothan, Alabama, as the co-anchor for the 5 o'clock and the solo anchor for the 10 o'clock news. During the period relevant to the pending action, Ken Henderson, who also uses the name Ken Curtis,[3] was the news director and plaintiff's supervisor. Aubrey Woods was the station's general manager and Henderson reported to him.

Plaintiff contends that Henderson began to engage in inappropriate behavior at the time of her interview when in the course of giving her a tour of Dothan he stopped at his home and asked her to come in.[4] She declined the invitation, and at the time dismissed the matter. Henderson testified at his deposition that although he did not have a specific memory of stopping at his home it is very probable that he did either to check the mail or to get a cold drink since it would have been August.[5]

Plaintiff also dismissed Henderson's initial request that she go out on a date with him. Plaintiff recalls that he asked her out about a month after she started working at the station. Plaintiff also recalls that a few weeks later, and again in late December, Henderson told her that he was going to date her when she was not working at the station anymore.[6] Although plaintiff did not construe Henderson's statements as a request for a date, she found the situation uncomfortable.[7] Plaintiff attempted to ignore Henderson and at times she would remind him that she was an employee and that he was the same age as her parents "to make it clear to him that [she] was not interested and felt offended by his remarks."[8] Plaintiff also informed Henderson that she had a boyfriend with whom she was quite happy.[9] Plaintiff alleges that Henderson also would make disparaging comments about her boyfriend.[10] Plaintiff recalls one occasion

---

**1.** *See also* Pretrial Order filed June 9, 1999 wherein plaintiff's contentions are limited to causes of action under Title VII, and Order granting motion to dismiss Kenneth Henderson filed June 16, 1999.

**2.** Since Morris Network of Alabama, Inc. is defendant's proper name, the court uses "Morris Network" to refer to defendant although the plaintiff refers to this defendant as Morris Newspaper Corporation.

**3.** Deposition Testimony of Kenneth Henderson, hereinafter referred to as "Henderson Deposition," at 3–4, filed May 11, 1999, Motion for Summary Judgment.

**4.** Declaration of Amy Early, hereinafter referred to as "Early Declaration," at ¶ 2, filed June 1, 1999, Plaintiff's Evidentiary Submission In Opposition to Summary Judgment.

**5.** Henderson Deposition at 106.

**6.** Early Declaration at ¶¶ 3, 7; Deposition Testimony of Amy Early, hereinafter referred to as "Early Deposition," at 53, filed May 11, 1999, Motion for Summary Judgment. *See also* Early Deposition, Defendant's Exhibit 4.

**7.** Early Deposition at 66, 84–85, 92.

**8.** Early Declaration at ¶¶ 2–4, 6–7. Early Deposition at 53.

**9.** Early Declaration at ¶ 6.

**10.** Early Declaration at ¶ 11; Early Deposition at 88–89. *See also* Early Deposition, Defendant's Exhibit 4

the week before Thanksgiving when Henderson put his arm around her shoulder while asking her about her boyfriend and suggesting that she drop her boyfriend for him. Plaintiff declined the suggestion.[11] She maneuvered away from Henderson when he finished talking but did not tell him that his conversation made her uncomfortable.[12] In his deposition testimony, Henderson denies that he asked plaintiff out for a date or made any suggestion that he would. He also testified that he could not recall whether he asked plaintiff if she had a boyfriend. Additionally, while he did not have any recollection of putting his arm around her shoulder, Henderson testified that if he did, it would have been in a nonsexual way.[13]

Plaintiff did tell Henderson that she was offended when he relayed a comment to her *allegedly* from one of his church's deacons. Plaintiff says that Henderson told her that the deacon said when he saw her on the news "he thought of doing things to her that he shouldn't." [14] Plaintiff questioned whether the comment was made and told Henderson, regardless, she did not want him to tell her such comments. Henderson also told her of similar comments from some men at Office Depot. Plaintiff alleges that when Henderson made such comments, he was touching or rubbing his genitals which was something that he did frequently in front of her and another female reporter.[15] Henderson recalls the comment from the church member and his conveyance to plaintiff solely as a compliment without any further innuendo.[16]

Another incident that the plaintiff found inappropriate was when Henderson complained about her hairstyle while she was doing a broadcast. Apparently during a break in her broadcast, Henderson approached her, grabbing her head complaining that he and Woods did not like her hair and that she had to do something about it. Plaintiff told Henderson not to ever touch her again. She considered Henderson's conduct to be "flat out mean" and contends that he never would have done that to a male anchor.[17] Plaintiff also complains that Henderson continued to make general criticisms about her hair and even suggested that she have a makeover by a makeup artist from a local mortuary.[18]

In addition to making inappropriate comments and asking her out on dates, plaintiff also alleges that Henderson held her to a more difficult work standard than her male colleagues. Plaintiff maintains that she was required to come into work at noon and often to work late but that the male sports anchor was late regularly and was not required to work at least forty hours per week or to do reports on local events. Plaintiff also complains that some male employees, specifically, Dennis Tugman, and the technical director, Terry Stovall, sometimes did not show for work and were not reprimanded.[19]

Plaintiff was terminated on January 22, 1997 following an incident with Stovall the evening before. Plaintiff and Stovall had a disagreement about whether a segment she was doing needed to be re-recorded. Plaintiff contends that Stovall told the camera operators to take her off the set and that when she went to talk to him in the control booth he screamed at her waving his arms and then kicked her out.[20] In

11. Early Deposition at 83–84. *See also* Early Deposition, Defendant's Exhibit 4.

12. Early Deposition at 84.

13. Henderson Deposition at 106–110, 113–116.

14. Early Declaration at ¶ 5.

15. Early Deposition at 80–82.

16. Henderson Deposition at 110–111.

17. Early Deposition at 75–77.

18. Early Deposition at 78.

19. Early Affidavit at ¶ 8 –9; Early Deposition at 125–130.

20. Early Deposition at 94–98.

his deposition testimony, Stovall confirms that he and plaintiff disagreed whether the segment needed to be re-taped.[21] He contends that when he initially advised plaintiff that he would not re-tape the segment she refused to continue the broadcast unless the segment was redone.[22] According to Stovall, he advised plaintiff that was fine and that she should get off the set. Stovall maintains that plaintiff confronted him in the control room screaming.[23] Plaintiff and Stovall then argued about who controlled the show and ended with Stovall telling plaintiff she could leave if she was not going to go on with the broadcast. Plaintiff did leave the station.[24] Plaintiff maintains that she left because she was frightened by Stovall's behavior and feared for her safety.[25] Another reporter was called in to finish the broadcast.

Prior to returning the work the next day plaintiff made several unsuccessful attempts to speak with Henderson about the incident.[26] Upon arriving at work, Henderson called plaintiff into a conference room and advised her that she was being terminated because she did not stay at the station as directed and she left without completing a broadcast.[27] Plaintiff denies that Henderson asked her to stay at the station until he got there.[28] When Henderson informed her that she was being terminated, plaintiff advised him that she "made note of every inappropriate thing [he had] ever said and done to [her]" and that she would report it.[29] Plaintiff contends that she did not report

Henderson's inappropriate behavior previously because she perceived Henderson and Woods, the general manager, to be friends and she thought she would lose her job if she said anything.[30]

## II.

As noted previously, in this action, plaintiff alleges that her employer, defendant Morris Network, is liable for the hostile work environment she endured as a result of Henderson's sexual harassment toward her. She also alleges that she was terminated because of her "refusal to accede to Henderson's sexual advances" and because of her gender.

To prevail on its motion for summary judgment, Morris Network must affirmatively negate an essential element of plaintiff's claims, or demonstrate that plaintiff's evidence is insufficient to establish an essential element of her claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Wu v. Thomas*, 847 F.2d 1480, 1484 (11th Cir. 1988). Conversely, to survive a motion for summary judgment, plaintiff's initial burden is to present evidence demonstrating that she can establish the basic elements of her claims. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. In considering the motion, the court must view all the evidence and inferences from the underlying facts in the light most favorable to the nonmovant plaintiff. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir.1990); *see also Matsushita Elec. Indus. Co. v. Zenith*

---

**21.** Deposition of Terry Stovall, hereinafter referred to as "Stovall Deposition," at 7–8, filed May 11, 1999, Motion for Summary Judgment.

**22.** Stovall Deposition at 9.

**23.** Defendant's Exhibit 1, Stovall Deposition.

**24.** Stovall Deposition at 9; Defendant's Exhibit 1, Stovall Deposition. *See also* Marcus Caylor Statement, Henderson Deposition, Plaintiff's Exhibit 1F.

**25.** Early Declaration at ¶ 18; Early Deposition at 98–99.

**26.** Early Deposition at 100.

**27.** Henderson Deposition at 162, 153–164.

**28.** Early Deposition at 99. *See also* Henderson Deposition at 151.

**29.** Early Declaration at ¶ 20; Early Deposition at 90–91.

**30.** Early Declaration at ¶ 13; Early Deposition at 103.

*Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court's function is to determine whether genuine, material issues of fact related to the claims that should be resolved by a jury exist; and if not, whether the movant is entitled to judgment as a matter of law. *DeLong Equip. Co. v. Washington Mills Abrasive Co.,* 887 F.2d 1499 (11th Cir.1989); *Dominick v. Dixie Nat'l Life Ins. Co.,* 809 F.2d 1559 (11th Cir.1987). *See also Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913, 919 (11th Cir.1993).

With these rules and principles of law in mind, the court will determine whether summary judgment is appropriate in the pending action.

## A. Sexual Harassment

Traditionally, claims alleging sexual harassment in the workplace are based on two legal theories: (1) *"quid pro quo"* harassment which occurs when an employee's job conditions, privileges or benefits are altered because she refuses to submit to sexual demands; and (2) *"hostile work environment"* harassment which occurs when the employee is subjected to conduct that has the purpose or effect of unreasonably interfering with her work performance or creating an intimidating, hostile or offensive work environment. *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Recently, however, the Supreme Court has limited the utility of distinguishing sexual harassment claims based on the legal theory in employer liability cases to "when there is a threshold question whether a plaintiff can prove discrimination in violation of Title VII." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, ——, 118 S.Ct. 2257, 2265, 141 L.Ed.2d 633 (1998). Based upon its review of the parties' submissions, the court finds that this action presents a threshold question whether plaintiff states a claim for sexual harassment, and therefore, finds it prudent to address her claims under each theory.

### a) *Quid pro quo* Sexual Harassment

A cause of action for *quid pro quo* sexual harassment exists if an employer alters an employee's conditions of employment as a result of the employee's refusal to submit to sexual demands. *Meritor Savings Bank,* 477 U.S. at 65, 106 S.Ct. 2399; *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1315 (11th Cir. 1989). In order to establish a claim of *quid pro quo* harassment a plaintiff must show (1) that she belongs to a protected group, (2) that she was subjected to unwelcome sexual harassment, (3) that the harassment complained of was based on gender, and (4) that her reaction to the harassment affected tangible aspects of her compensation, or terms, conditions or privileges of employment. *Henson v. City of Dundee,* 682 F.2d 897, 909 (11th Cir. 1982). Additionally, it is essential that the plaintiff show a nexus between the harassing conduct and a job related reprisal. *Johnson v. Wal–Mart Stores, Inc.,* 987 F.Supp. 1376 (M.D.Ala. 1997); *Mills v. Wex–Tex Indust., Inc.,* 991 F.Supp. 1370, 1379–1380 (M.D.Ala.1997); *Sneed v. Montgomery Hous. Auth.,* 956 F.Supp. 982, 986 n. 3 (M.D.Ala.1997). *See, e.g., Henson,* 682 F.2d at 908–910 (male supervisor conditioned his recommendation for plaintiff to attend police academy upon her having sexual relations with him). While the alleged harasser's request or offensive conduct does not need to be specifically and expressly intertwined with a job benefit or detriment, there should be a reasonable "verbal/temporal" relationship between the offensive request or conduct and discussion of the employee's job benefit or detriment. *Fowler v. Sunrise Carpet Indust., Inc.,* 911 F.Supp. 1560, 1578 (N.D.Ga.1996) (*relying on Nichols v. Frank,* 42 F.3d 503, 512–513 (9th Cir.1994)).

In this action, the pivotal issue that the court must resolve is whether plaintiff's termination was reprisal because she did not respond favorably to Henderson's comments that he was going to date plaintiff when she no longer worked at the

station. At the onset, the court finds that there is a significant question whether the Henderson's comments that he was going to date plaintiff when she did not work at the station, as well as any outright request for a date, is sufficiently offensive to be actionable as a sexual harassment claim. *See, Graham v. Florida Dept. of Corrections*, 1 F.Supp.2d 1445 (M.D.Fla.1998) (five unsolicited and unwelcome requests for a date in which plaintiff perceived "sexual overtures" within eight week period is not conduct that is actionable under Title VII). Generally, it is necessary that the complained of conduct have a sexual connotation. *See, e.g., Fowler*, 911 F.Supp. 1560 (supervisor's inquiries about plaintiff's sexual activities as well as conversing about his own constituted sexual advances); *Bridges v. Eastman Kodak Co.*, 885 F.Supp. 495 (S.D.N.Y.1995) (supervisor's use of foul language, sexual innuendo, referring to women in derogatory terms and criticizing women in terms of their sexuality was actionable as a *quid pro quo* harassment claim). However, because it may be possible for a reasonable jury, under some circumstances to consider persistent requests for dates to be sexually offensive, and at this stage of the proceedings, the court is compelled to grant inferences in favor of the plaintiff, the court will permit a generous interpretation of Henderson's comments as within the realm of offensive conduct. *See Prescott v. Independent Life and Acc. Ins. Co.*, 878 F.Supp. 1545 (M.D.Ala.1995). *See also Mills v. Wex–Tex Indust.*, 991 F.Supp. at 1380. The court cannot, however, be so generous in finding a sufficient nexus between Henderson's conduct and plaintiff's termination.

It is evident, and plaintiff does not contend otherwise, that Henderson's comments do not explicitly condition any job benefit or detriment upon plaintiff's compliance with his requests. As plaintiff recognizes, her *quid pro quo* harassment claim rests upon, at best, an inference of adverse employment action, in this case termination, if she was not responsive to

Henderson's interest in dating her. Thus, her claim is an implicit *quid pro quo* sexual harassment claim. Plaintiff contends that there is a sufficient nexus between Henderson's comments and conduct and her termination because since Henderson said he was going to date her when she did not work at the station anymore, the only way he would be able to accomplish that goal was to terminate her, which he did. While plaintiff concedes that Henderson did not explicitly threaten her employment, she contends that "his motive" can be inferred by his comments. *See* Plaintiff's Brief in Opposition to Summary Judgment filed June 1, 1999 at 17.

■ Whether implicit or explicit, there must in fact be some evidence of a threatened or promised impact on employment. In the pending action, the inference that the plaintiff advocates is too tenuous and not supported by the evidence. First, interpreting Henderson's comment that he was going to date plaintiff when she no longer worked at the station as a threat that she would be terminated is a strenuous exercise. The comments were not expressed to plaintiff in the context of discussions related to her work performance or continued employment status. Plaintiff's interpretation of Henderson's comment is further undermined by the fact that although, Henderson made such comments and requests shortly after plaintiff began working at the station, and she was not responsive to his requests, plaintiff received a pay raise as Henderson said he would deliver at the time that plaintiff was hired. *See* Early Declaration at ¶ 16. Additionally, it cannot be overlooked that plaintiff's termination was preceded by a legitimate dispute between plaintiff and Stovall regarding a broadcast taping. This intervening event further dispels a connection between Henderson's comments and plaintiff's termination. The occurrence of this intervening event also makes plaintiff's reliance on *Brewer v. Petroleum Suppliers, Inc.*, 946 F.Supp. 926 (N.D.Ala. 1996) and *Hazel v. School Bd. of Dade*

*County, Florida,* 7 F.Supp.2d 1349 (S.D.Fla.1998), inappropriate. In each of these actions, the plaintiff's employment status was changed shortly after she complained of her supervisor's conduct although there had not been any prior concerns with her work performance.[31] In the pending action, there is no indication that plaintiff complained about Henderson's comments to any superior, and plaintiff's termination occurred after a legitimate job related dispute. There is not sufficient evidence to raise a triable issue of fact that plaintiff's termination was reprisal for her refusal to respond favorably to Henderson's comments about wanting to date her. Accordingly, this portion of plaintiff's sexual harassment claim is due to be dismissed.

### b) Hostile Work Environment

■ To support a hostile work environment claim, the plaintiff must show that she was subjected to sexual harassment that was "sufficiently severe or pervasive 'to alter the conditions of [the plaintiff's] employment and create an abusive work environment.'" *Meritor Savings Bank,* 477 U.S. at 67, 106 S.Ct. 2399 (*quoting Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982)). It is not enough for the plaintiff to show that her workplace is offensive; she must show that her workplace was "permeated with discriminatory intimidation, ridicule, and insult," *id.* at 65, 106 S.Ct. 2399, such that a reasonable person would perceive the environment as hostile or abusive. *Id.* at 67, 106 S.Ct. 2399; *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

■ It is important for the court to be mindful that in protecting an employee from an abusive or hostile work environment under Title VII, an employer is not obligated to protect an employee from the "innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, ——, 118 S.Ct. 998, 1001, 140 L.Ed.2d 201 (1998). Determining whether the complained of conduct extends beyond the boundaries of misguided, awkward interaction between men and women and within the parameter of severe and pervasive extreme conduct that Title VII is intended to protect requires balancing between what is objectively reasonable and subjectively offensive. To make this determination relevant factors for the court to consider include "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. 367. *See, e.g., Edwards v. Wallace Community College,* 49 F.3d 1517 (11th Cir.1995). In order to be actionable under Title VII, the harassing conduct must create an environment that a reasonable person would find hostile or abusive, and that the complaining employee subjectively perceived to be hostile and abusive. *Oncale,* 523 U.S. at ——, 118 S.Ct. at 1003; *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The requirement that the conduct be objectively hostile and offensive is "crucial," and essential "to ensure that courts and juries do not mistake ordinary socializing in the workplace—such as male-on-male horseplay or intersexual flirtation—for discriminatory 'conditions of employment.'" *Id.* Thus, conduct that may be objectionable and inappropriate, but a natural result of social interaction in the workplace is not necessarily actionable. *See Oncale,* 523 U.S. at ——, 118 S.Ct. at 1002 (observing that the legal standard required to state a claim under Title VII protects against the statute expanding into a "general civility code.")

---

**31.** It also is noteworthy that *Hazel* was before the court on a motion to dismiss which requires a much lesser evidentiary standard.

■ Looking at the totality of the circumstances in the pending action, the court finds that there is sufficient evidence to raise a triable issue of fact whether plaintiff was subjected to a hostile work environment as a result of Henderson's conduct toward her. While generally an expression of a desire to date someone at work or complimenting a colleagues appearance can fall within the realm of social interaction in the workplace, such requests can rise to an objectionable level if persistent, or accompanied with sexual innuendo. In addition to Henderson's unwelcome and inappropriate comments about dating her, plaintiff contends that Henderson also passed on comments allegedly from viewers that approached vulgarity, and that he touched himself in a sexual manner when he shared those comments with her, as well as on other occasions. Also, upon looking at the totality of the circumstances, the court finds that the disparity of positions between plaintiff and Henderson, specifically, that Henderson was plaintiff's supervisor and a person with whom she had direct and frequent contact, could lead a reasonable objective person in the same subordinate position as plaintiff to infer a demanding connotation that moves his comments and conduct beyond the realm of social interaction in the workplace. That Henderson denies that his conduct was as plaintiff states merely creates an issue of fact that make resolution of this matter turn on a credibility assessment and therefore, precludes summary judgment.

■ While the court finds that plaintiff's hostile work environment claim survives summary judgment, it does not retract from its finding stated above, that there is not a sufficient connection between the harassing conduct that plaintiff complains about and her termination. *See Burlington Indust.*, 534 U.S. at ——, 118 S.Ct. at 2271. Therefore, Morris Network is not precluded from pursuing an affirmative defense to escape liability by showing that plaintiff did not take advantage of any preventive or corrective measures particularly reporting Henderson's conduct. *Id. See also Faragher v. City of Boca Raton*, 524 U.S. 777, ——, 118 S.Ct. 2275, 2293, 141 L.Ed.2d 662 (1998). While plaintiff admits that she did not make such report to anyone at the station or within the Morris Network company, she contends that she was unaware of any reporting procedure other than speaking to the station general manager and that she did not pursue that option because she felt the general manager was friendly with Henderson. Again, since plaintiff's proffered explanation requires a credibility assessment, the court cannot find that Morris Network establishes an affirmative defense as a matter of law and summary judgment would be inappropriate.

### B. Disparate Treatment

Plaintiff alleges that she was subjected to disparate treatment because, unlike similarly situated male colleagues, there were greater work demands placed on her and she was subjected to more harsh discipline, specifically, termination.

The ultimate issue in a gender disparate treatment claim is whether the defendant intentionally discriminated against plaintiff because of her gender. *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). Since direct evidence of discriminatory animus can be difficult to produce, a plaintiff often must rely on circumstantial evidence to support her claim of disparate treatment. In evaluating this circumstantial evidence, the court is guided by the three step procedure enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ Under the *McDonnell Douglas–Burdine* analysis, the court first considers whether the plaintiff presents a prima facie case of discrimination. *Burdine*, 450 U.S. at 253–254, 101 S.Ct. 1089; *McDon-*

*nell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. To establish a prima facie case of disparate treatment enforcement of work rules the plaintiff must show that (1) she is a member of a protected class; (2) she has engaged—either (a) disputedly or (b) admittedly—in misconduct similar to persons outside the protected class; and (3) that similarly situated employees outside plaintiff's protected class received more favorable treatment. *Jones v. Bessemer Carraway Medical Ctr.,* 137 F.3d 1306, 1311 n. 6 (11th Cir.1998), *modified in non-relevant part on denial of reh'g,* 151 F.3d 1321 (11th Cir.1998) (modifying *Jones v. Gerwens,* 874 F.2d 1534, 1540 (11th Cir.1989)). *See also Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997).

To establish her prima facie case, plaintiff first argues that she did not violate a work rule by not completing the taping, the reason proffered by Henderson for her termination, because there was not any work rule making such conduct a terminable offense. The court finds this contention completely untenable. Without question, any employee is expected to fulfill the responsibilities of her position. The absence of a "disciplinary rule" in that regard is not evidence of a lack of offense but more appropriately evidence of an expectation of professionalism. There is no legal principle that limits matters for which an employee may be subject to discipline only to those that are specifically proscribed by company policy.

■ Plaintiff also contends that since she was directed to leave the set by the director she could not be subject to discipline for following his directive. The court recognizes that if plaintiff's explanation for leaving the set is deemed credible her decision to leave could be considered acceptable. However, such evidence would merely demonstrate that her termination was unreasonable, not that it was discriminatorily motivated. Absent evidence that

the determination that it was improper for her to leave the station without completing the broadcast was because of her gender, the decision to terminate her for that conduct cannot be actionable as gender discrimination. *See Nix v. WLCY Radio/Rahall Comms.,* 738 F.2d 1181, 1187 (11th Cir.1984).

■ Additionally, plaintiff fails to state a prima facie case of disparate treatment because she does not identify any "similarly situated" male employees who were treated less severely or more favorably when they engaged in similar conduct that subjected her to discipline. She must show that she and the male employee are similarly situated in all relevant respects including their positions and responsibilities, and the offense giving rise to the challenged employment action. *Holifield,* 115 F.3d at 1561–1562. Plaintiff argues that Stovall regularly argued with staff members, sometimes yelling, and that another staff member, Dennis Tugman, missed news briefs but that neither of them were disciplined. First, the court points out that there is no indication that plaintiff suffered any adverse employment decisions because of her inappropriate interaction with other staff members.[32] Thus, Stovall is not an appropriate comparator. While it is not necessary for a female employee to present evidence that a male employee committed the exact offense as she, the conduct should be comparable. Morris Network submits that Tugman's missing news briefings was different from plaintiff's situation because Tugman suffered from a sleep disorder and he did not intentionally miss the briefing. Plaintiff, on the other hand, did not complete a broadcast with a full crew present in which she was the only live on-air personality. The court agrees that situations simply are not comparable and are not of the same severity. Thus, plaintiff fails to state a prima facie case of disparate treatment.

---

**32.** The court recognizes that in his deposition testimony Henderson states that plaintiff had difficulties relating to some staff members. However, there is no indication that plaintiff was ever subjected to discipline because of those difficulties. Additionally, Henderson is very clear that plaintiff was termination as a result of the situation with Stovall in taping the night show.

The court also finds that plaintiff failed to submit sufficient evidence to support her general complaints that she was subjected to a more demanding work schedule because of her gender. Plaintiff complains that the sports anchor, and another reporter were not required to work the hours that were required of her. As a co-anchor for one broadcast and a solo anchor for another, plaintiff's position and responsibilities were distinctly different from her other on-air colleagues. Therefore, the individuals identified by plaintiff are not appropriate comparators, and do not demonstrate disparate treatment toward her.

## IV.  CONCLUSION

For the foregoing reasons, it is hereby ORDERED that the motion for summary judgment filed by the defendants on May 11, 1999 be GRANTED in part and DENIED in part as follows:

1. The motion is GRANTED as to plaintiff's claims for *quid pro quo* sexual harassment and disparate treatment based on gender and those claims are hereby DISMISSED with prejudice; and

3. The motion is, in all other respects, DENIED.